IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 21, 2015 Session

**MARK A. GRANT v. KATHY H. GRANT**

**Appeal from the Circuit Court for Montgomery County**
**No. MCCCCVDN122589      Ross H. Hicks, Judge**

_____

**No. M2014-01835-COA-R3-CV – Filed May 12, 2016**
_____

After a long-term marriage, the wife obtained a divorce based on the husband's inappropriate marital conduct. The trial court determined the value of the marital property, divided the marital estate, and awarded the wife both alimony in futuro and alimony in solido. The husband appealed, arguing the court erred in valuing his ownership interests in three general partnerships, in dividing the marital estate, and in awarding the wife alimony. After reviewing the extensive record in this case, we affirm the trial court's decision.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Gregory D. Smith and Brenton H. Lankford, Nashville, Tennessee, for the appellant, Mark A. Grant.

Larry Hayes, Jr. and Ashley S. Rudy, Nashville, Tennessee, for the appellee, Kathy H. Grant.

**OPINION**

**I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

On October 22, 2012, Mark A. Grant ("Husband") filed a complaint for absolute divorce from Kathy H. Grant ("Wife") in the Circuit Court for Montgomery County, Tennessee claiming irreconcilable differences. Wife filed an answer and counterclaim,

alleging Husband was guilty of inappropriate marital conduct. The court granted Wife a divorce on the ground of inappropriate marital conduct based on Husband's admitted adultery.

The parties did not dispute the classification of their property interests. The focus in the trial court was on the valuation and division of those interests. The trial court held a two-day hearing to determine: (1) the appropriate value and equitable distribution of the marital estate; (2) whether Wife should be awarded alimony in future; and (3) whether to award Wife her attorneys' fees and costs.

A. PROOF AT THE HEARING

1. Testimony of the Parties

Husband and Wife, at the time of the hearing, were in their fifties. They married each other twice. During their first marriage, they had one son, now an adult, and Wife spent his early years as a full-time homemaker. After eleven years of marriage, Husband and Wife divorced briefly and then remarried in 1992.

During the second marriage, Husband continued to be the primary wage earner and Wife, a homemaker. Husband is a successful real estate developer. He is the sole owner of Grant Construction, Inc. ("GCI"), a residential construction company. He also has a minority interest in several real estate development partnerships, and he is a fifty-percent partner in Clarksville Bonding, a bail-bonding company. Husband has earned a gross annual income of over one million dollars in each of the last five years. In 2012, his personal financial statement listed his net worth at $10.4 million.

Husband and Wife enjoyed a good standard of living. In 2011, they established the Grant Family Trust for the benefit of their adult son. They owned a nice house in Clarksville and a lake house in Kentucky but, otherwise, did not spend lavishly. As Husband related, "we always had the option, if we wanted to do something, we could." Wife testified they traveled to destinations such as Mexico and the Grand Caymans.

Husband testified that, when he first started GCI, he obtained construction loans to operate the business. When his financial situation improved, he began his current practice of loaning personal funds to GCI for construction projects. He also invested funds he inherited from his parents in GCI. The loans Husband made to GCI from the parties' personal accounts are represented on GCI's books as a promissory note. While the amount of the note fluctuates, at the time of the hearing, it totaled $1,845,435. Since 2009, Husband has received between $200,000 and $400,000 each year as wages from GCI. He testified his accountant determined the amount of his salary each year based on tax considerations.

2

When the parties' son reached school age, Wife began to work part-time for the local school system. At Husband's request, she quit her job and went to work for GCI. She ran errands, did clerical work, and eventually, did some bookkeeping for the company. Over the course of a year in the late 1990s, Husband stopped working at GCI because he was experiencing panic attacks and suffering from lethargy and depression. During this time, Wife supported Husband emotionally and increased her involvement with GCI. She continued to work for GCI until early 2013 when the parties separated. While, on paper, Wife was compensated for her work at GCI, in reality, her salary was reinvested in the business.

Husband has a minority ownership interest in three general partnerships: Fox Meadow, Fox Crossing and Fields of Northmeade. These partnerships buy land, develop it for residential subdivisions, and sell the individual lots to builders, including GCI. The partnerships do not pay realtor commissions when selling these lots. Husband has a twenty percent interest in Fox Meadow, which owns the Fox Meadow subdivision. He has a fifty percent interest in Fox Crossing, which owns the Fox Crossing subdivision and twenty-eight acres of undeveloped adjacent land. He also has a thirty-three percent interest in Fields of Northmeade. Fields of Northmeade owns three subdivisions, the Fields of Northmeade, Crosswinds, and Wellington Fields, and a substantial amount of undeveloped adjacent land.[1] In recent years, Husband's annual income from these partnerships has varied from $350,000 to over $1 million.

Husband testified that, when he told Wife he wanted a divorce, he gave her the option of keeping the marital home or moving to a new home. She chose to move to a new home that Husband purchased for her, and Husband remained in the marital residence.

Wife filed a statement listing her anticipated income and expenses after the divorce. Wife is currently unemployed and has no plans to seek employment. She testified she has no marketable skills and the skills she obtained working at GCI are not transferrable to another employment situation. She estimated her total monthly expenses to be $11,074. A portion of that monthly total is due to an anticipated monthly mortgage on a new home Wife plans to build. Wife testified she never intended to remain in her current residence on a long-term basis. She simply needed to move quickly after her husband filed for divorce.

Husband admitted he was having an affair during the marriage. Husband spent a significant amount of marital funds for the benefit of his paramour during the pendency of

---

[1] The appraisal reports submitted by the parties indicate Fields of Northmeade owns over 70 acres of undeveloped land adjacent to Wellington Fields and 24.59 acres of undeveloped land adjacent to Crosswinds. Husband testified at the hearing that the seventy-acre parcel had been developed for a subdivision and lots were ready to sell.

the divorce in violation of the court's statutory injunction. Husband testified he also paid his attorneys and his expert witnesses from marital funds.

Husband admitted that he had an unspecified amount of cash in a safe in his home that he failed to disclose. He also failed to disclose all of his bank accounts or to provide the proper authorizations for Wife's attorney to obtain information about his bank accounts. Husband also withheld information about real property he owned through his real estate partnerships and the note receivable from GCI.

2. Valuation Testimony

Both parties presented evidence of the value of the marital property. On appeal, Husband only contests the trial court's valuation of his ownership interest in the real estate development partnerships. Thus, we will only summarize the valuation evidence relevant to these partnerships.

George Pritchett, Husband's appraiser, provided an opinion as to the value of the subdivisions and undeveloped land owned by the partnerships. Mr. Pritchett testified he was instructed to value the assets as of December 31, 2013, even though he viewed the properties several months later. He admitted that, if improvements had subsequently been made to the properties, the appraised values would increase.

In appraising the subdivisions, Mr. Pritchett used the subdivision development or anticipated use methodology. This methodology assumes the owner sells all available lots at fair market value to one hypothetical purchaser. To arrive at a present value, he projected future lot revenues, subtracted the expenses of ownership, and discounted that amount back to present value. As part of his assumption of the expenses of ownership, Mr. Pritchett deducted a seven percent cost of sale. Mr. Pritchett testified he made this deduction because most owners would incur such costs. On cross-examination, he agreed that, if he eliminated this deduction, his appraised value would increase by approximately four percent.

Wife hired two appraisers, Mark Young and Larry Sharp, to value the partnership assets. Each appraiser appraised separate properties and provided values as of March 2014. Both experts used the same methodology as Mr. Pritchett, but neither of Wife's experts deducted cost of sale as an expense of ownership.

Husband hired Michael Wallace to value his interest in the real estate development partnerships. Mr. Wallace used a net asset value approach. He assumed the partnership assets had the value provided by Mr. Pritchett. He admitted that, if Mr. Pritchett's appraised values were faulty, it would affect his ultimate determination of value. He then deducted the fair market value of the partnership debt to arrive at an equity valuation.

Next, he applied a discount for Husband's minority ownership interest. Mr. Wallace explained that it was appropriate to apply a lack of control discount whenever an owner was not in the position to control a business. Using data from a control premium study, he determined a base lack of control discount and compared his results to the amount of lack of control discounts previously approved by Tennessee courts. Then, he applied a corresponding discount to each partnership.

Mr. Wallace also applied a discount for lack of marketability. He agreed Husband had no intention of selling his interests but found a discount for lack of marketability would still be necessary in determining value. He defined the discount as "the gauge of a readily available market to turn a particular interest into cash." He also explained that the partnership agreements had provisions restricting a partner's ability to sell his interest. Based on restricted stock studies and prior Tennessee cases concerning valuation of closely-held businesses, Mr. Wallace arrived at a base discount amount. He then calculated a pro rata discount for each partnership. Thus, he applied an eighteen percent discount for lack of marketability to Fields of Northmeade, a twelve percent discount to Fox Crossing, and a thirty percent discount to Fox Meadow.

Wife's valuation expert, Scott Womack, used the same valuation methodology as Mr. Wallace. However, he used the appraised values provided by Mr. Young and Mr. Sharp. He agreed a lack of control discount was appropriate in view of Husband's minority ownership position. He disagreed, however, with the application of a discount for lack of marketability. He opined that a discount for lack of marketability should not be applied when Husband had no intention of selling his interest.

As additional evidence of value, Wife submitted Husband's personal financial statements since 2009. In those statements, Husband valued his partnership interests substantially higher than Mr. Wallace's value. Vernon Weakley, another minority partner in Fields of Northmeade and Fox Meadow, testified he valued his partnership interest higher than Mr. Wallace's estimation as well.

## B. CIRCUIT COURT RULING

The trial court issued a final decree on September 11, 2014. With regard to Husband's interest in the real estate development partnerships, the court determined that Mr. Pritchett's appraised values for the subdivision properties were artificially low. The court found Wife's appraisals were more accurate because the date of these appraisals was closer to the date of the hearing. The court also found Mr. Pritchett should not have deducted cost of sale in light of the evidence that Husband never incurred such costs when selling subdivision lots.

The court considered the evidence presented by both valuation experts and found Mr. Womack's valuation more credible. The court was concerned by the large discounts for

5

lack of marketability used by Mr. Wallace. With regard to Fields of Northmeade, the court noted Husband's testimony that a large portion of the previously undeveloped land had been developed and was currently being sold, which increased the value of the partnership assets. Also, one of Husband's partners had testified he valued his ownership interest in this partnership at a much higher value than Mr. Wallace. Based on the evidence at the hearing, the court chose to apply a "slight discount for marketability" instead of the eighteen percent used by Mr. Wallace.

The court used a similar analysis for valuing Husband's interest in Fox Meadow and Fox Crossing. In both partnerships, the court chose the appraised values closer to the date of the hearing. The court rejected the use of a cost of sale discount in the sale of subdivision lots. The court also found it inappropriate to apply such a large discount for lack of marketability in the absence of proof Husband intended to sell his interests.

Once the court valued all the marital assets, the court equitably divided the marital estate. The court chose a relatively equal distribution based on the length of this marriage. The court awarded three real estate properties, including the marital residence and its furnishings to Husband. The court awarded another house, with its furnishings to Wife. Each party also received one vehicle. Husband also received a golf cart and fishing boat. The court agreed with the parties' suggestion that Husband be awarded his various business interests because he had the expertise and the ability to operate them. Because the court awarded these interests to Husband, to balance the division, the court awarded Wife a substantial portion of the parties' bank accounts and the note receivable from CGI.

The court found Husband had lied several times during this case. He lied about when his affair began and trips he had taken during the marriage with his paramour. Since filing for divorce, Husband had spent substantial marital funds on his paramour in contravention of the statutory injunction prohibiting such behavior. With regard to Husband's assets, the court specifically found Husband had "either withheld information or was less than forthright about the information he disclosed, making it difficult for Wife and her counsel to obtain reliable information."

After considering the statutory factors, the court awarded Wife alimony in futuro of $10,000 per month. The court found Wife was 53 years old, unemployed, relatively uneducated, with limited job experience. Husband, on the other hand, had consistently earned over one million dollars a year. Because Husband had been awarded all of his income-producing business assets, the court determined he would be able to continue his high earnings in the future. The court found Wife, on the other hand, could not maintain the same standard of living enjoyed during the marriage without substantially encroaching on the assets awarded to her in the divorce. Based on these findings, the court concluded Wife was economically disadvantaged and incapable of rehabilitation.

6

The court also awarded Wife her attorneys' fees. The court noted Husband's attempts to hide his assets had increased the amount of her fees and Husband had paid his attorneys' fees from marital assets. In addition to attorneys' and expert witness fees already awarded, the court ordered Husband to pay an additional $58,500 to Wife for her remaining balance.

## II. ANALYSIS

Husband raises a number of issues on appeal. He contends the trial court erred in not applying a lack of marketability discount when valuing his interests in three real estate development partnerships. With regard to the division of the marital estate, Husband argues the trial court erred in its evaluation of the parties' future earning capacity, in its consideration of his contributions of separate property to the marital estate, in not considering the tax consequences of the division, and in awarding most of the liquid assets to Wife. Husband also appeals the court's award of alimony in futuro and attorneys' fees to Wife.

### A. VALUATION OF MARITAL ASSETS

We begin our analysis with Husband's contention the trial court erred in its valuation of his partnership interests. As this court stated in *Wallace v. Wallace*, 733 S.W.2d 102 (Tenn. Ct. App. 1987):

> The value of marital property is a fact question. Thus, a trial court's decision with regard to the value of a marital asset will be given great weight on appeal. In accordance with Tenn. R. App. P. 13(d), the trial court's decisions with regard to the valuation and distribution of marital property will be presumed to be correct unless the evidence preponderates otherwise.
>
> The value of a marital asset is determined by considering all relevant evidence regarding value. The burden is on the parties to produce competent evidence of value, and the parties are bound by the evidence they present. Thus the trial court, in its discretion, is free to place a value on a marital asset that is within the range of the evidence submitted.

*Id*. at 107 (citations omitted).

Both parties presented expert testimony as to the value of Husband's partnership interests. A major difference between the expert opinions was the use of a large discount for lack of marketability. According to Mr. Wallace, when using the fair market value standard to value a business interest, "it is almost compulsory to consider the impact [lack of marketability] has on the interest." Mr. Womack did not apply a similar discount based on

7

his belief that Tennessee courts would not allow such a discount in a divorce case in the absence of proof the interest was to be sold.

The trial court found a large discount for lack of marketability was inappropriate in this case. The court applied a "slight discount" for lack of marketability to the Fields of Northmeade partnership because "Husband might be compelled to sell some portion of his assets in order to accomplish the property divisions ordered by the Court while still maintaining and supporting the remaining business interests." The court applied no lack of marketability discount to the Fox Meadow partnership or the Fox Crossing partnership. In both instances, the trial court noted Husband had no intention of selling his interest in the partnerships.

Valuation experts apply discounts for lack of marketability to reflect the lack of liquidity of an ownership interest, i.e. how quickly and easily it can be converted into cash. Patrice L. Ferguson & John E. Camp, *Valuation Basics and Beyond: Tackling Areas of Controversy*, 35 Fam. L.Q. 305, 324 (2001). Thus, experts consider using this type of discount when no ready market exists for an interest or when the provisions in a partnership agreement restrict the ability of a partner to liquidate the interest. Edwin T. Hood et al., *Valuation of Closely Held Business Interests*, 65 UMKC L. Rev. 399, 449-50 (1997). Generally, applicability of the use a lack of marketability discount depends on the characteristics of the ownership interest being valued, not whether the owner of the interest actually intends to sell the interest. *See id.*

In the context of a proceeding involving the valuation and division of marital assets, courts sometime find application of a lack of marketability discounts inappropriate, but in many instances, the decision to apply the discount is seen as discretionary. *See* Stephen A. Hess, Annotation, *Use of Marketability Discount in Valuing Closely Held Corporation or Its Stock*, 16 A.L.R.6th 693 (2006).[2] We also conclude the decision is discretionary and

---

[2] With respect to valuing closely held corporations, another instance in which a lack of marketability discount is often appropriate, we recognize the approach of courts in other states is somewhat mixed:

Dissolution of marriage proceedings are somewhat unique in that stock is often not transferred during the proceeding, but rather is valued and left in the hands of one of the parties subject to an adjustment in the way other assets are distributed. Courts disagree as to the propriety of utilizing marketability discounts when valuing shares in a marital dissolution proceeding. Some courts view the equities of valuation as similar to those in a dissenter rights case in which the absence of a voluntary transfer precludes the use of a marketability discount, and hold instead that the Court must assign full proportionate value of a party's interest without reduction for lack of marketability. Other courts value the stock under the traditional measure of "fair market value" and utilize discounts where properly invoked, or choose not to utilize discounts based on the specific facts before the court—rather than imposing a legal bar on such discounts.

dependent on the facts of the case. *See, e.g., Barnes v. Barnes*, No. M2012-02085-COA-R3-CV, 2014 WL 1413931, at *9 (Tenn. Ct. App. Apr. 10, 2014), *appeal denied* (Sept. 18, 2014) (finding lack of marketability discount inappropriate under the facts); *Halliday v. Halliday*, No. M2011-01892-COA-R3-CV, 2012 WL 7170479, at *5 (Tenn. Ct. App. Dec. 6, 2012) (finding lack of marketability discount applicable to husband's interest in one limited liability company but not to husband's interest in another limited liability company based on the facts). Under the facts of this case, we find no abuse of discretion in the trial court's application of a "slight" discount for lack of marketability for one general partnership but not applying a discount for the other two. "Placing a value on a minority interest in a business is not an exact science." *Owens v. Owens*, 241 S.W.3d 478, 489 (Tenn. Ct. App. 2007). This same logic applies to valuation of a minority interest in a general partnership. "Since valuation evidence is inherently subjective, a trial court's valuation decisions need not coincide precisely with the valuation opinions offered into evidence." *Id.*

Here, the trial court's determination of value is within the range of evidence offered by the parties. The court heard the testimony of the appraisers and found the appraised values closer to the date of the hearing were more accurate. The timing of the valuation of marital assets is within the trial court's discretion. *Wallace*, 733 S.W.2d at 106. The court also found Mr. Pritchett erroneously deducted cost of sale when appraising the subdivisions. Mr. Wallace agreed his final value would increase if the appraised values he used were artificially low. The court also had additional evidence in this record, including the testimony of Vernon Weakley and Husband's personal financial statements, that evidenced a value higher than the value found by Mr. Wallace. Resolving this type of factual dispute is uniquely the role of the trial court. *See Powell v. Powell*, 124 S.W.3d 100, 104-05 (Tenn. Ct. App. 2003). We cannot say the evidence preponderates against the court's decision.

## B. EQUITABLE DIVISION OF THE MARITAL ESTATE

After valuing the marital property, the court's next task is equitably dividing it between the parties. *Owens*, 241 S.W.3d at 489. To reach an equitable division, the trial court must weigh the relevant statutory factors. Tenn. Code Ann. § 36-4-121(c) (Supp. 2015);[3] *Larsen-Ball v. Ball*, 301 S.W.3d 228, 234-35 (Tenn. 2010). The trial court's division

---

16 A.L.R.6th 693, 711 (internal cross-references omitted).

[3] The court must consider all relevant factors, including:

       (1) The duration of the marriage;
       (2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
       (3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

9

is entitled to great weight on appeal and should not be overturned unless it "lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures." *Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007) (quoting *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996)). The division of marital property "is not a mechanical process." *Flannary v. Flannary*, 121 S.W.3d 647, 650 (Tenn. 2003). In light of the particular facts of the case, some statutory factors may be more relevant than others. *See Tate v. Tate*, 138 S.W.3d 872, 875 (Tenn. Ct. App. 2003). "We review the trial court's findings of fact de novo with a presumption of correctness and honor those findings unless the evidence preponderates to the contrary." *Larsen-Ball*, 301 S.W.3d at 235; Tenn. R. App. P. 13(d).

Husband takes issue with the trial court's evaluation of the parties' earning capacity. *See* Tenn. Code Ann. § 36-4-121(c)(2). The evidence in this case does not preponderate against the court's finding that Husband has a much higher earning capacity than Wife. Husband is a successful real estate developer with an ownership interest in five businesses. He has earned a substantial income whether the focus is on gross or net income. Wife has no business experience other than working for Husband, no college degree, and no income. Contrary to Husband's assertions, Wife's employment at GCI did not provide her with the skills to earn an income comparable to his. Both parties agreed Wife lacks the expertise to

---

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed.

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121(c).

operate Husband's businesses. Although Husband contends he will be unable to achieve his same level of financial success after the divorce, this record reflects he will have the skills and means to continue to be successful.

Husband asserts the trial court failed to consider his contribution of Clarksville Bonding and his inheritance money to the marital estate. One factor the court considers in dividing marital property is the contribution of each party to the "acquisition, preservation, appreciation, depreciation or dissipation" of the marital estate. Tenn. Code Ann. § 36-4-121(c)(5)(A). While the trial court's opinion does not expressly mention Husband's contribution of this separate property, we find no reversible error in the court's consideration of this factor. In evaluating the separate contributions of the parties, the court must give equal weight to the contributions of a party as a homemaker, if he or she fulfilled that role. *Id.* Husband testified Wife was a good mother who spent many years caring for their child. The court also found Wife made substantial contributions to the marital estate when she supported Husband through his period of illness by helping to keep GCI operating. In its discretion, the trial court could find both parties had made equal contributions to the marital estate especially in light of the longevity of this marriage. *See* Tenn. Code Ann. § 36-5-121(c)(2) (2014) ("The general assembly finds that the contributions to the marriage as homemaker or parent are of equal dignity and importance as economic contributions to the marriage."). Moreover, the trial court also specifically found Husband had dissipated marital assets during his affair, another appropriate consideration under this factor.

Husband also argues the trial court erred in not considering the tax consequences of the division. *See* Tenn. Code Ann. § 36-4-121(c)(9). According to Husband, his portion of the marital estate is not as valuable as Wife's because of his tax obligations. Since Husband does not intend to dispose of any of his assets in the near future, his only tax consequence from this division is future income tax liability. *See Jekot v. Jekot*, 232 S.W.3d 744, 749 (Tenn. Ct. App. 2007) (stating it would be pure speculation to attempt to estimate tax consequences in the absence of proof a spouse intends to sell a particular asset). Every spouse in a divorce must pay income taxes on post-divorce income. This record contains no proof of any additional tax consequences. We find no error in the trial court's consideration of this factor.

"In the final analysis, the appropriateness of the trial court's division depends on its results." *Altman v. Altman*, 181 S.W.3d 676, 683 (Tenn. Ct. App. 2005). The parties have accumulated a sizable marital estate. After considering the relevant statutory factors, the trial court awarded 51.83% of the marital estate to Husband[4] and 48.17% to Wife. An essentially

---

[4] Husband argues the trial court erroneously included his future earnings in valuing his portion of the marital estate, citing *Morey v. Morey*, No. 01-A-01-9506-CV00243, 1995 WL 739565, at *1 (Tenn. Ct. App. Dec. 15, 1995). The sole issue on appeal in *Morey* was the proper classification of post-divorce income under a work-for-hire employment contract. *Id*. at *1. We find *Morey* inapplicable to the issues in this case. To the

11

equal division in a long marriage such as this one[5] is appropriate. *See Phelps v. Phelps*, No. M2010-00856-COA-R3-CV, 2011 WL 2535026, at *6 (Tenn. Ct. App. June 24, 2011) (noting the general presumption that a long-term marriage supports an essentially equal division of the marital estate). Husband's reliance on *Nesbitt v. Nesbitt*, No. M2006-02645-COA-R3-CV, 2009 WL 112538 (Tenn. Ct. App. Jan. 14, 2009) and *Hoggatt v. Hoggatt*, No. E2013-00508-COA-R3-CV, 2014 WL 1901019 (Tenn. Ct. App. May 12, 2014) to argue for a greater portion of the estate is misplaced. Both cases involved relatively short-term marriages in which the equities differed from the instant case.

Finally, Husband asserts the overall division of the estate is inequitable because the court awarded the bulk of the liquid assets to Wife. Husband contends his lack of available cash will negatively impact his ability to operate his businesses. Once the trial court awarded the business interests to Husband, the trial court had no other option than to award a substantial portion of the remaining assets to Wife. *See Goodwin v. Goodwin*, No. E2009-01085-COA-R3-CV, 2010 WL 669244, at *11 (Tenn. Ct. App. Feb. 25, 2010). "The trial court was not required to provide liquidity to either or both of the parties; the court's only responsibility was to divide the estate in an equitable fashion." *Brock v. Brock*, 941 S.W.2d 896, 903 (Tenn. Ct. App. 1996). We cannot say the evidence preponderates against the trial court's division.

## C. ALIMONY IN FUTURO

We next turn to the trial court's award of $10,000 per month to Wife as alimony in futuro. "[T]rial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). In reviewing the trial court's award of alimony, we apply an abuse of discretion standard. *Id.* "An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Id.*

Alimony in futuro is "intended to provide support on a long-term basis until the death or remarriage of the recipient." *Id.* at 107; Tenn. Code Ann. § 36-5-121(f)(1) (2014). This

extent Husband's future earnings are included in the valuation of his business interests, Husband submitted proof of the value of his business interests as going concerns, and he is bound by the evidence he presented. *Wallace*, 733 S.W.2d at 107.

[5] In considering the duration of the parties' marriage, the trial court combined the length of their two marriages. Stacking the parties' two marriages was improper, *see Flanagan v. Flanagan*, 656 S.W.2d 1, 3 (Tenn. Ct. App. 1983), but this error does not affect the outcome of this case. Even considering the length of the second marriage alone, the parties' marriage was of a long duration.

long-term support is awarded when one spouse is relatively economically disadvantaged and rehabilitation is not feasible. *Id.* Rehabilitation is not feasible if,

> the disadvantaged spouse is unable to achieve, with reasonable effort, an earning capacity that will permit the spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

Tenn. Code Ann. § 36-5-121(f)(1). Even though awards of this type of spousal support are disfavored, alimony in futuro may be awarded under the proper circumstances. *Bratton v. Bratton*, 136 S.W.3d 595, 605 (Tenn. 2004); *see Gonsewski*, 350 S.W.3d at 109.

Before awarding alimony, the court considered the relevant statutory factors. Tenn. Code Ann. § 36-5-121(i) (2014).[6] During this long-term marriage, Wife fulfilled the role of

---

[6] The relevant factors include:

> (1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
> (2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
> (3) The duration of the marriage;
> (4) The age and mental condition of each party;
> (5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
> (6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;
> (7) The separate assets of each party, both real and personal, tangible and intangible;
> (8) The provisions made with regard to the marital property, as defined in § 36-4-121;
> (9) The standard of living of the parties established during the marriage;
> (10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
> (11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

13

homemaker while Husband was the wage earner. Both parties made significant contributions to the marriage. They enjoyed a high standard of living. While they did not spend lavishly, their financial means provided them with the ability to do whatever they wished. Husband has admitted he was at fault in the demise of this marriage.

The disparity in relative earning capacity between these spouses is clearly established. Husband has been earning well over $600,000 per year after taxes. After this divorce he will retain ownership of all of his business interests and should continue to earn a good standard of living. While he may be forced to seek construction loans in the short term, his experience and business acumen should allow him to quickly overcome this hurdle. Moreover, he will continue to receive partnership[7] and rental income. The loss of the relatively minimal amount of interest income he previously received should not have a significant impact on his future earnings.

By contrast, Wife is unemployed with no appreciable work history other than working for Husband's business. The skills Wife acquired during her time at GCI will not equip her to obtain more than a minimum wage job. At age 53, it is difficult to imagine what type of additional training Wife could obtain to enable her to be employed at a higher rate of pay before she reached retirement age. *See Jekot*, 232 S.W.3d at 753 (agreeing Wife, at 55 years of age, would have difficulty competing for employment even with additional training).

Although Wife was awarded almost half of the marital estate, without support, Wife will be forced to quickly deplete those assets to meet her living expenses. Husband contends she could meet her needs by simply investing the cash she was awarded. Husband's own tax returns reveal the fallacy in Husband's argument. In 2013, Husband's interest income from the parties' cash assets was $13,409, an amount insufficient to cover Wife's anticipated monthly living expenses of $11,074. While Husband argues Wife's anticipated expenses are speculative, the trial court heard the testimony of both parties and accepted Wife's evidence of need. We will not disturb the trial court's determinations of credibility and weight of testimony without clear and convincing countervailing evidence. *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

---

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121.

[7] Husband argues the trial court erred in considering his future income from the real estate development partnerships in his ability to pay alimony because he was awarded these interests in the division of the estate. Husband's reliance on Tennessee Code Annotated § 36-4-121(b)(1)(E) to support his argument is misplaced. In determining alimony, the court may consider income from assets awarded in the division of the marital estate "to the extent the asset will create additional income after the division." Tenn. Code Ann. § 36-4-121(b)(1)(E) (Supp. 2015).

14

The most important considerations in determining spousal support are the "disadvantaged spouse's need and the obligor spouse's ability to pay." *Gonsewski*, 350 S.W.3d at 110. This record supports the trial court's finding that Husband has the ability to pay alimony. Wife also established she is in need of support. We find no abuse of discretion in the trial court's award.

### E. ATTORNEYS' FEES

Finally, we turn to Husband's argument that the trial court erred in ordering him to pay an additional $58,500 to Wife for her remaining attorneys' fees. "The allowance of attorney's fees is largely in the discretion of the trial court, and the appellate court will not interfere except upon a clear showing of abuse of that discretion." *Aaron v. Aaron*, 909 S.W.2d 408, 411 (Tenn. 1995). Generally, an award of attorneys' fees to a spouse is appropriate if the spouse lacks sufficient funds to pay their own legal expenses. *Koja v. Koja*, 42 S.W.3d 94, 98 (Tenn. Ct. App. 2000). Wife's portion of the marital estate is her main source of future income. She is not required to use her source of future income to pay her legal expenses. *See Batson v. Batson*, 769 S.W.2d 849, 862 (Tenn. Ct. App. 1988). The trial court specifically found Husband's actions during the pendency of this divorce increased the amount of Wife's legal expenses and Husband used marital funds to pay his own expenses. We find no abuse of discretion in the trial court's decision to award Wife an additional $58,500 as alimony in solido.

### III. CONCLUSION

For the foregoing reasons, we affirm the decision of the trial court.

_____
W. NEAL MCBRAYER, JUDGE

15